# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date:  **NOVEMBER 16, 2015**

**NO. 33,310**

**NATALIE F. GARCIA,**

Plaintiff-Appellant,

v.

**HATCH VALLEY PUBLIC SCHOOLS,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

Law Firm of Daniela Labinoti, P.C.
Daniela Labinoti
El Paso, TX

for Appellant

German & Associates, LLC
Ethan D. Watson
Elizabeth L. German
Albuquerque, NM

for Appellee

**OPINION**

**ZAMORA, Judge.**

{1}    In this reverse discrimination claim under the New Mexico Human Rights Act (NMHRA), NMSA 1978, §§ 28-1-1 to -15 (1969, as amended through 2007), Plaintiff Natalie Garcia appeals from a summary judgment entered by the district court against her. We conclude that the district court erred in determining that Plaintiff's employer, Hatch Valley Public Schools (HVPS), was entitled to summary judgment as a matter of law. We also conclude that Plaintiff presented sufficient evidence below to create genuine issues of material fact. We reverse and remand for further proceedings consistent with this Opinion.

**BACKGROUND**

{2}    Plaintiff, who has a Hispanic surname by marriage, but identifies herself as Caucasian and of German descent, was employed as a bus driver for HVPS. In March 2010, Plaintiff's job performance was evaluated. The evaluation form included eleven categories of competence to be evaluated. For each category, competence was to be described as meeting expectations, needing improvement, or unsatisfactory.

{3}    Plaintiff's evaluation, signed by her supervisor on March 17, 2010, indicated that her performance met expectations in five of the eleven categories, and needed improvement in four of the categories. Two categories were marked both as meeting expectations and needing improvement. Plaintiff's performance was not evaluated as

unsatisfactory in any category. The notes on Plaintiff's evaluation indicated that she needed improvement with regard to the upkeep and cleanliness of her bus as well as her interpersonal relationships. The notes also indicated that Plaintiff was meeting expectations with regard to her attitude and willingness to assume extra duties, constructive use of her time, taking initiative, and acceptance of her supervisor's recommendations.

{4} In April 2010, HVPS notified Plaintiff it would not renew her employment contract, citing an "unsatisfactory evaluation." Plaintiff exhausted her administrative remedies with the New Mexico Human Rights Commission (NMHRC) and filed the present action in state court claiming that HVPS had unlawfully discriminated against her. Plaintiff's initial complaint alleged that HVPS had discriminated against Plaintiff on the basis of her race and national origin, in violation of the NMHRA, and in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e)(1) to -(17) (2012) (Title VII). Plaintiff claimed that she had been subjected to discrimination "because of her race and/or national origin being of Caucasian descent" and that she was treated differently from her co-workers because she was not Hispanic. Plaintiff subsequently amended her complaint omitting her Title VII claims.

{5} HVPS moved for a judgment on the pleadings, arguing that Hispanics are by definition, the same race as Caucasians, and Plaintiff therefore, had failed to state a

claim as to discrimination based on race. HVPS further argued that Plaintiff failed to state a claim as to discrimination based on national origin because the complaint did not specify Plaintiff's national origin. Plaintiff argued that her complaint, which alleged discrimination based on her status as a non-Hispanic, sufficiently alleged that she belonged to a protected class and adequately stated both racial and national origin related discrimination claims. The district court found that Plaintiff had not set forth the elements necessary to state a cause of action for discrimination based on national origin, but did not make any finding as to whether Plaintiff had properly alleged her claim of racial discrimination. Plaintiff was permitted to amend her complaint to set forth the elements "necessary to go forward with her claims."

{6} Plaintiff filed a second amended complaint and a subsequent "corrected" second amended complaint, which alleged that HVPS discriminated against her on the basis of her national origin. Plaintiff identified herself as being of German descent, but maintained that she experienced disparate treatment because she was not Hispanic. HVPS moved for summary judgment, which the district court granted. This appeal followed.

**DISCUSSION**

**Standard of Review**

{7} We review a grant of summary judgment de novo. *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 8, 139 N.M. 12, 127 P.3d 548. "All reasonable inferences from the record should be made in favor of the nonmoving party." *Id.* The non-moving party must come forward and establish with admissible evidence that a genuine issue of material fact exists. *Id.* ¶ 15. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* ¶ 8 (internal quotation marks and citation omitted).

{8} The NMHRA tracks the language of Title VII, which makes it unlawful for an employer to discriminate against an individual on the basis of race, national origin, or ancestry. When interpreting the NMHRA our Supreme Court has looked to federal decisions for guidance.[1] *Smith*, 1990-NMSC-020, ¶ 9. For claims of unlawful discrimination the Court has used the burden shifting methodology set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Gonzales v. N.M. Dep't of Health*, 2000-NMSC-029, ¶¶ 20-21, 129 N.M. 586, 11 P.3d 550.

---

[1]The Court has cautioned that its "reliance on the methodology developed in the federal courts, however, should not be interpreted as an indication that we have adopted federal law as [its] own." *Smith v. FDC Corp.*, 1990-NMSC-020, ¶ 9, 109 N.M. 514, 787 P.2d 433.

4

{9} Under this framework Plaintiff bears the initial burden of demonstrating a prima facie case of discrimination by showing "that [she] is a member of the protected group, that [she] was qualified to continue in [her] position, that [her] employment was terminated, and that [her] position was filled by someone not a member of the protected class[,]" or that "[she] was dismissed purportedly for misconduct nearly identical to that engaged in by one outside of the protected class who was nonetheless retained." *Smith*, 1990-NMSC-020, ¶ 11 (citing *Hawkins v. CECO Corp.*, 883 F.2d 977, 982 (11th Cir.1989). A plaintiff "then has the opportunity to rebut the employer's proffered reason as [pretextual]." *Juneau*, 2006-NMSC-002, ¶ 9.

**Non-Hispanics are a Protected National Origin Group Under the NMHRA**

{10} In its motion for summary judgment, HVPS argued that since it was unaware of Plaintiff's German descent, it could not have discriminated against her on that basis, and that there was a legitimate business purpose for not renewing Plaintiff's employment contract, which was not shown to be pretextual. Plaintiff, in turn, argued that HVPS *was* aware that she was not Hispanic and that she was subject to discrimination based on her status as a non-Hispanic. The district court found that HVPS was not aware of Plaintiff's asserted national origin, therefore, Plaintiff's national origin could not, as a matter of law, have been a motivating factor in the decision to terminate her employment. The court did not address Plaintiff's

5

contention that the discrimination was based on her status as a non-Hispanic. We conclude that this was error on the part of the district court.

{11}     Though Plaintiff eventually identified herself as being of German descent, her primary contention from the outset was that HVPS was aware that she was not Hispanic, and discriminated against her on that basis. HVPS challenges the description of non-Hispanic as a protected national origin group under the NMHRA. Plaintiff argues that discrimination based on ethnic distinctions, such as Hispanic and non-Hispanic can appropriately be brought as claims for national origin discrimination. Our Supreme Court has not expressly addressed this issue. As we previously stated, where there is no New Mexico precedent which resolves issues regarding the NMHRA, we look to federal law interpreting Title VII for guidance. *Smith*, 1990-NMSC-020, ¶ 9.

{12}     The United States Supreme Court has stated that the term " 'national origin' on its face refers to the country where a person was born, or, more broadly, the country from which his or her ancestors came." *Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973). However, in *Espinoza* the Court also noted that hiring applicants "of Anglo-Saxon background but refusing to hire those of Mexican or Spanish ancestry" or "Spanish-speaking background" would constitute national origin discrimination,

suggesting that the term national origin can be interpreted broadly and does not require the identification of a specific country of origin. *Id.* at 92 n.5, 95.

{13}   Following *Espinoza*, courts have interpreted the concept of national origin to "embrace a broader class of people," and found the term to be "better understood by reference to certain traits or characteristics that can be linked to one's place of origin, as opposed to a specific country or nation." *Kanaji v. Children's Hosp. of Phila.*, 276 F. Supp. 2d 399, 401-02 (E.D. Pa. 2003). Courts have also interpreted national origin discrimination to encompass discrimination based on ethnic distinctions. *See Pejic v. Hughes Helicopters, Inc.*, 840 F.2d 667, 672-73 (9th Cir. 1988) (holding that national origin discrimination could include discrimination based on membership in ethnic groups); *see also Beltran v. Univ. of Tex. Health Sci. Ctr.*, 837 F. Supp. 2d 635, 641 (S.D. Tex. 2011) (stating that "Title VII prohibits employment discrimination against any national origin group, including larger ethnic groups, such as Hispanics" (emphasis, internal quotation marks, and citation omitted)).

{14}   Classifications such as Caucasian, white, and non-Hispanic have been widely accepted as protected in cases involving national origin discrimination claims. *See Turney v. Hyundai Constr. Equip. USA Inc.*, 482 F. App'x. 259, 260 (9th Cir. 2012) (holding that the plaintiff who identified as Caucasian "belongs to a protected class for purposes of his national origin discrimination claim because Title VII applies to

any racial group, whether minority or majority" (internal quotation marks and citation omitted)); *Hawn v. Exec. Jet Mgmt., Inc.*, 546 F. Supp. 2d 703, 711, 717 (D. Ariz. 2008) (holding that the plaintiff who identified his national origin as "Caucasian American of European descent" was a member of a protected class); *Mohr v. Dustrol, Inc.*, 306 F.3d 636, 639-40 (8th Cir. 2002) (treating non-Hispanic as a protected class and reversing summary judgment on the plaintiff's race and national origin discrimination claims), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003); *Stern v. Trustees of Columbia Univ.*, 131 F.3d 305, 306, 312 (2d Cir. 1997) (finding that a "white American male of Eastern European origin" satisfied a prima facie case for national origin discrimination); *Cameron v. St. Francis Hosp. & Med. Ctr.*, 56 F. Supp. 2d 235, 238-39 (D. Conn. 1999) (memo.) (accepting classification of "white, non-Hispanic male of Scottish/European origin" as protected class for national origin discrimination claim (internal quotation marks omitted)).

{15} These decisions are consistent with the EEOC's definition of national origin discrimination, which includes, but is not limited to "the denial of equal employment opportunity because of an individual's, or his or her ancestor's, place of origin; or because an individual has the physical, cultural or linguistic characteristics of a national origin group." 29 C.F.R. § 1606.1 (2015). We also note that according to the EEOC's Compliance Manual, "[n]ational origin discrimination . . . includes

discrimination against anyone who does *not* belong to a particular ethnic group, for example, less favorable treatment of anyone who is not Hispanic." EEOC Compl. Man., Nat'l Origin Discrimination, § 13-II(B) (2002), *available at* http://eeoc.gov/policy/docs/national-origin.html (last visited October 28, 2015). We find these authorities persuasive. We reject HVPS' argument and conclude that national origin discrimination claims based on the ethnic distinction between Hispanics and non-Hispanics are actionable under the NMHRA.

**Reverse Discrimination Under the NMHRA**

{16}     By claiming that she was subject to discrimination on account of being white and non-Hispanic, Plaintiff alleges that she was subject to reverse discrimination. *See Black's Law Dictionary* 567 (10th ed. 2014) (defining "reverse discrimination" as the "[p]referential treatment of minorities, [in] a way that adversely affects members of a majority group; [specifically], the practice of giving unfair treatment to a group of people who have traditionally been privileged in an attempt to be fair to the group of people unfairly treated in the past").

{17}     The prima facie case, as originally applied in race and national origin discrimination cases, required a plaintiff to demonstrate that they belonged to a racial minority. *McDonnell Douglas Corp.*, 411 U.S. at 802. This test cannot be strictly applied in reverse discrimination cases. *Mills v. Health Care Serv. Corp.*, 171 F.3d

9

450, 454 (7th Cir. 1999) (stating that the plaintiff—a white male—clearly did not satisfy prong one of the prima facie case of discrimination (which requires a showing that the plaintiff is a member of a protected minority class) and that "if strictly applied, the prima facie test would eliminate all reverse discrimination suits").

{18}  Our Supreme Court has not addressed the applicability of the *McDonnell Douglas* methodology to claims of reverse discrimination, or how a plaintiff alleging reverse discrimination can demonstrate that he belongs to a protected group. Accordingly, we once again look to federal law. *See Smith*, 1990-NMSC-020, ¶ 9.

**Title VII and Reverse Discrimination**

{19}  The United States Supreme Court has acknowledged that although Title VII was intended to eradicate discriminatory practices that disadvantaged minority citizens, its plain language prohibits discriminatory preference for *any* racial group. *See Griggs v. Duke Power Co.*, 401 U.S. 424, 429-31 (1971) (stating that "[t]he objective of Congress in the enactment of Title VII is plain from the language of the statute. It was to achieve equality of employment opportunities and remove barriers that have operated in the past to favor an identifiable group of white employees over other employees[,]" but recognizing that in enacting Title VII, Congress proscribed "[d]iscriminatory preference for *any group, minority or majority*" (emphasis added)); *see also McDonnell Douglas*, 411 U.S. at 800 (same).

{20} In *McDonald v. Santa Fe Trail Transportation Co.*, 427 U.S. 273 (1976), Title VII's applicability to claims of reverse discrimination was officially recognized. The United States Supreme Court applied the *McDonnell Douglas* framework even though the plaintiffs in that case could not satisfy the first requirement by demonstrating that they belonged to a racial minority. *McDonald*, 427 U.S. at 279 n.6, 280 (holding that "Title VII prohibits racial discrimination against the white petitioners in this case upon the same standards as would be applicable were they [members of a racial minority]" and noting that the specification of the prima facie proof required under *McDonnell Douglas* "is not necessarily applicable in every respect to differing factual situations").

{21} Courts recognize that a strict application of the *McDonnell Douglas* framework would preclude reverse discrimination claims because the first prong would disqualify majority plaintiffs. *Mills*, 171 F.3d at 454. *McDonald* establishes that this result would be contrary to the language and scope of Title VII. 427 U.S. at 279-80, 282-83. The United States Supreme Court has not provided explicit guidance as to how the *McDonnell Douglas* framework should be adapted or modified in reverse discrimination cases, and federal circuit courts are divided on how to resolve the question. Generally, federal circuits have approached the issue in one of two ways;

11

either heightening the standard for reverse discrimination of plaintiffs by requiring evidence of discrimination at the outset, or not.

**Heightening the Standard—The Background Circumstances Requirement**

{22} The background circumstances standard was introduced by the United States Court of Appeals for the District of Columbia in *Parker v. Baltimore & Ohio Railroad Co.*, 652 F.2d 1012, 1017-18 (1981). The Court explained the *McDonnell Douglas* framework was "not an arbitrary lightening of the plaintiff's burden, but rather a procedural embodiment of the recognition that our nation has not yet freed itself from a legacy of hostile discrimination." *Parker*, 652 F.2d at 1017. The Court determined that the first prong of the prima facie case should be modified in reverse discrimination cases so that, instead of showing membership in a protected minority class, a majority plaintiff would be required to show background circumstances that support the suspicion that the defendant is the unusual employer who discriminates against the majority. *Id.*

{23} The Sixth Circuit followed *Parker* but held that reverse discrimination plaintiffs must show two things under the first prima facie prong: (1) that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority"; and (2) "that the employer treated differently[,] employees who were similarly situated but not members of the protected

12

group." *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985) (internal quotation marks and citation omitted). The court recognized that applying the background circumstances standard heightens the burden for majority plaintiffs by essentially requiring a demonstration of intentional discrimination at the outset. *Id.*

**The Tenth Circuit Standard—A Modified Test**

{24}     The Tenth Circuit attempted to ease the burden on majority plaintiffs with its modified version of the background circumstances test. *Notari v. Denver Water Dep't*, 971 F.2d 585, 589 (10th Cir. 1992). The court determined that a heightened burden for majority plaintiffs was appropriate in light of the purpose of Title VII, but that where a majority plaintiff is unable show background circumstances through direct evidence, he should be entitled to proceed beyond the prima facie stage by presenting evidence sufficient to raise a reasonable inference of discrimination. *Id.* at 590. Under the modified test, a majority plaintiff may state a prima facie case by either using the background circumstances test or by showing "indirect evidence sufficient to support a reasonable probability, that but for the plaintiff's status [as a member of the majority] the challenged [action] would have favored the plaintiff." *Id.*

{25} Though *Notari* attempted to lower the background circumstances standard by providing an alternative way for majority plaintiffs to make out a prima facie case of discrimination, it is not clear how the alternative test is any easier to meet. In order for a plaintiff to meet the "but for" test, he would have to show facts indicating regular discrimination against the majority—a requirement similar to the *Parker* standard. *See Mills*, 171 F.3d at 456 (affirming the requirement of direct evidence, and stating that, where a majority plaintiff has no direct evidence and has failed to establish background circumstances, he must produce "other indirect evidence sufficient to support a reasonable probability[,] that but for his status as a white male the challenged employment decision would not have occurred" (alterations, internal quotation marks, and citation omitted)).

**Pros and Cons of a Heightened Standard**

{26} Proponents of the heightened standard point out that the primary purpose of Title VII is "to assure equality of employment opportunities and to eliminate those discriminating practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *Murray*, 770 F.2d at 67 (internal quotation marks and citation omitted). Moreover, proponents assert the inference of discrimination raised by the *McDonnell Douglas* prima facie case is based on the presumption that minorities are disadvantaged in the workplace, a

14

presumption that does not apply to majority plaintiffs. *See Harding v. Gray*, 9 F.3d 150, 153 (D.C. Cir. 1993).

{27}     Critics of this approach argue that it places an unconscionably high burden on majority plaintiffs and virtually eliminates the burden shifting framework of *McDonnell Douglas*, which was designed to allow Title VII plaintiffs to proceed with their claims despite the unavailability of direct evidence. *See Collins v. Sch. Dist. of Kansas City*, 727 F. Supp. 1318, 1321 (W.D. Mo. 1990) (stating that the *McDonnell Douglas* framework was "a procedural embodiment of the recognition that employment discrimination is difficult to prove with only circumstantial evidence" and that "*Parker* shifts the entire burden back to the plaintiff in one fell swoop").

{28}     It should also be noted that imposing a heightened burden on majority plaintiffs is difficult to reconcile with United States Supreme Court precedent. *See Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (stating that the prima facie case, as stated in *McDonnell Douglas*, "was never intended to be rigid, mechanized, or ritualistic" and that the "central focus of the inquiry in a [discrimination] case . . . is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin" (internal quotation marks and citation omitted)); *see also McDonald*, 427 U.S. at 279 n.6, 280 n.8 (1976) (holding that "Title VII prohibits racial discrimination against the white petitioners

15

in this case upon the *same standards* as would be applicable were they [members of a racial minority]" and noting that the specification of the prima facie proof required under *McDonnell Douglas* "is not necessarily applicable in every respect to differing factual situations" (emphasis added) (internal quotation marks and citation omitted)).

{29}     Another potential pitfall of the background circumstances approach is that the application of the standard would require courts to determine "which groups are 'socially favored' and which are 'socially disfavored'." *Collins*, 727 F. Supp. at 1322. This is an unseemly task where "minority status for purposes of a prima facie case could have regional or local meaning." *Id*. at 1322 n.2 (internal quotation marks and citation omitted).

{30}     Currently, the background circumstances approach is followed by the United States Court of Appeals for the District of Columbia, as well as the Sixth and Eighth circuit courts. *See Woods v. Perry*, 375 F.3d 671, 673 (8th Cir. 2004), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031 (8th Cir. 2011); *Murray*, 770 F.2d at 67; *Parker*, 652 F.2d at 1017. The modified background circumstances test is followed by the Tenth and Seventh Circuits. *See Notari*, 971 F.2d at 589; *see also Mills*, 171 F.3d at 457.

{31}     State courts in New Jersey and Ohio have also adopted the heightened standard. *See Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 799 (N.J. 1990)

16

(stating that "when a complainant is a member of the majority and not representative of persons usually discriminated against in the work place, discrimination directed against that person is unusual" and "modification of the *McDonnell[]Douglas* first-prong is appropriate" (internal quotation marks omitted)); *see also Jones v. MTD Consumer Grp., Inc.*, 2015-Ohio-1878, ¶ 27, 32 N.E.3d 1030 (holding that in order to establish a prima facie case of reverse discrimination, "a plaintiff must demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority" (alteration, internal quotation marks, and citation omitted)).

**Rejection of the Heightened Standard**

{32} Several circuit courts have declined to apply a heightened standard in reverse discrimination cases. In *Iadimarco v. Runyon*, the Third Circuit expressly rejected *Parker*, *Notari*, and their progeny. *Iadimarco*, 190 F.3d at 161-62. The court identified several problems with the background circumstances approach including: (1) Title VII and United States Supreme Court precedent do not support a heightened standard; (2) a heightened standard undermines *McDonnell Douglas* by eliminating some of the burden shifting to the employer; (3) the concept of background circumstances is "irremediably vague and ill-defined," which has prevented courts using the standard from clearly defining this standard; and (4) application of the

17

standard may lead to jury confusion since evidence of background circumstances will likely duplicate or overlap evidence of pretext. *Iadimarco*, 190 F.3d at 160-63.

{33} The Third Circuit also noted that while the *McDonnell Douglas* framework provided an allocation of burdens and order of presentation of proof for a discrimination claim, the central focus in discrimination cases should be on "whether the employer is treating some people less favorably than others because of their race." *Iadimarco*, 190 F.3d at 160 (internal quotation marks and citation omitted). The court concluded that a plaintiff alleging reverse discrimination should only be required to provide sufficient evidence "to allow a fact finder to conclude that the employer is treating [him or her] less favorably than others based upon a [protected] trait." *Id.* at 161.

{34} The Second, Fourth, and Fifth Circuits have altered the first *McDonnell Douglas* prong such that plaintiffs are not required to show that they belong to a minority class, but rather that they belong to a protected group. *See McGuinness v. Lincoln Hall*, 263 F.3d 49, 53 (2d Cir. 2001) (stating that the first prong of the prima facie case can be satisfied by a showing that a plaintiff is "within a protected group"); *see also Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 426 (5th Cir. 2000) (acknowledging a marked retreat from the "racial minority" requirement and holding that a plaintiff need not show that he belongs to a racial minority in order to make out

18

a prima facie case of reverse discrimination under Title VII); *Lucas v. Dole*, 835 F.2d 532, 533 (4th Cir. 1987) ("To establish a prima facie case under *McDonnell Douglas*, a plaintiff must show [that] she is a member of a protected group[.]").

{35}    All three circuits have held that majority plaintiffs are a protected group under Title VII and have not imposed a heightened burden of proof in reverse discrimination cases. *See McGuinness*, 263 F.3d at 53-55 (holding that the plaintiff established a prima facie Title VII case based on race by proffering evidence that she was white); *see also Byers*, 209 F.3d at 426 (rejecting the argument that the plaintiff had failed to make out a prima facie case of discrimination because he was not a minority); *Lucas*, 835 F.2d at 534 (stating that the plaintiff "is a member of a protected group, whites").

{36}    The Eleventh Circuit has adopted a similar standard. *See Bass v. Bd. of Cnty. Comm'rs*, 256 F.3d 1095, 1103 (11th Cir. 2001), *overruled on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008). In the context of traditional race discrimination cases, the Eleventh Circuit has adopted a formulation of *McDonnell Douglas* that requires the plaintiff to show that he belongs to a protected class rather than to a protected minority. *Hawkins v. CECO Corp.*, 883 F.2d 977, 982 (11th Cir.1989) (in banc). Considering the elements of a prima facie case of reverse discrimination the Court stated that "[r]acial discrimination against whites is just as

19

repugnant to constitutionally protected values of equality as racial discrimination against blacks. Therefore, we will treat [the plaintiff's claims] as discrimination claims, not as 'reverse discrimination' claims, and we will analyze [them] exactly as we would any racial discrimination claim." *Bass*, 256 F.3d at 1103-04.

**Pros and Cons of Abandoning the Heightened Standard**

{37}    Courts seem to be trending away from imposing a heightened burden on reverse discrimination plaintiffs. Even the Sixth Circuit, which currently uses the most stringent formulation of the background circumstances test, has questioned whether it should modify its approach. *See Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 257 (6th Cir. 2002) (expressing concern that "the background circumstances prong, only required of reverse discrimination plaintiffs, may impermissibly impose a heightened pleading standard on majority victims of discrimination" (internal quotation marks and citation omitted)); *see also Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 n.7 (6th Cir.1994) (stating "[w]e have serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts").

{38}    Proponents of the heightened standard fear that abandoning the background circumstances test will "stifle legitimate employment decisions to diversify and

correct the historical imbalance for which Title VII was enacted[,]" and undermine the legislative intent of Title VII. *See* Ryan Mainhardt & William Volet, *The First Prong's Effect on the Docket: How the Second Circuit Should Modify the McDonnell Douglas Framework in Title VII Reverse Discrimination Claims*, 30 Hofstra Lab. & Emp. L.J. 219, 259-60 (2012).

{39}    However, the trend toward a more "holistic assessment" of evidence in Title VII claims is consistent with current United States Supreme Court precedent, sidesteps the trappings of the background circumstances test, provides a uniform standard for all plaintiffs while maintaining the burden shifting framework of *McDonnell Douglas*, and is more workable in regions where it is becoming more common for a white person to be in the minority. Mainhardt & Volet, *supra*, at 258-59.

{40}    Currently, the Second, Fourth, Fifth, and Eleventh Circuits have rejected a heightened standard, along with state courts in Florida, Michigan, and Texas. *See McGuinness*, 263 F.3d at 53; *see also Iadimarco*, 190 F.3d at 161; *Lucas*, 835 F.2d at 533; *Byers*, 209 F.3d at 426; *Bass*, 256 F.3d at 1103; *Scholz v. RDV Sports, Inc.*, 710 So. 2d 618, 623 (Fla. Dist. Ct. App. 1998) (requiring that a plaintiff alleging a claim of reverse discrimination prove that he or she belongs to a class rather than requiring "the plaintiff to show the existence of background circumstances which

support the suspicion that the defendant is that unusual employer who discriminates against the majority" (alteration, internal quotation marks, and citation omitted)); *Lind v. City of Battle Creek*, 681 N.W.2d 334, 335 (2004) (holding that in order to establish a prima facie case of intentional disparate treatment under the *McDonnell Douglas* framework, a reverse discrimination plaintiff need not establish "background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority" (internal quotation marks and citation omitted)); *Piazza v. Cinemark, USA, Inc.*, 179 S.W.3d 213, 215 (Tex. Ct. App. 2005) (treating a reverse discrimination plaintiff as a member of a protected class and applying *McDonnell Douglas* without imposing a heightened burden).[2]

---

[2]California and Delaware have also rejected the heightened burden, however the relevant decisions in those states are unpublished. *See Ennis v. Del. Transit. Corp.*, C.A. No. S13C-09-028 THG, 2015 WL 1542151, at 5 n.46, (Del. Super. Ct. Mar. 9, 2015) ("A white plaintiff alleging disparate treatment in a reverse discrimination case is not expected to prove any additional *prima facie* elements to satisfy his initial *McDonnell Douglas* burden. A reverse discrimination plaintiff is only required to establish that which a minority is expected to prove in the typical employment discrimination case." (internal quotation marks and citation omitted)); *Berro v. Cnty. of Los Angeles*, No. B223515, 2014 WL 7271181, at 6 n.6, (Cal. Ct. App. Dec. 22, 2014) (noting that while some federal courts have imposed an increased burden on Caucasian plaintiffs alleging racial discrimination under Title VII, "no California court has required a Caucasian plaintiff to make such a heightened showing in order to establish a claim under [the California Fair Employment and Housing Act, Ann. Cal. Gov. Code, §§ 12940 to 12956.2 (1980, as amended through 2015)] for reverse racial discrimination, and we decline to impose such a requirement here").

***McDonnell Douglas* in New Mexico**

{41}  In *Smith*, the New Mexico Supreme Court considered how a prima facie case of discrimination could be made out under the NMHRA. 1990-NMSC-020, ¶¶ 9-11. The Court looked to *McDonnell Douglas* for guidance concerning the shifting of evidentiary burdens. *Smith*, 1990-NMSC-020, ¶¶ 9-10. However, the Court recognized that the *McDonnell Douglas* framework "is not a required method of proof; it is only a tool to focus the issues and to reach the ultimate issue of whether the employer's actions were motivated by impermissible discrimination." *Smith*, 1990-NMSC-020, ¶ 10.

{42}  The Court determined that the first prong of a prima facie case of discrimination could be satisfied upon a "showing that the plaintiff is a member of the *protected group.*" *Id.* ¶ 11 (emphasis added). It is worth noting that, in addition to recognizing the *McDonnell Douglas* framework as a tool rather than a mechanical formula, the Court chose the more neutral term "protected group" in setting out the first requirement of a prima facie case of discrimination, and the Court relied on precedent from federal circuits that take the more holistic and less rigid approach to analyzing reverse discrimination claims. *Smith*, 1990-NMSC-020, ¶¶ 9-11.

{43}  After reviewing these authorities, we conclude that Plaintiff is not required to meet a heightened standard. Applying a formulation of the *McDonnell Douglas*

23

prima facie case that holds both discrimination and reverse discrimination plaintiffs to the same standards reflects the purpose and philosophy behind Title VII as expressed by the United States Supreme Court. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 273 (1986) (O'Connor, J., plurality opinion) (stating that "[r]acial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination" and "the level of scrutiny does not change merely because the challenged classification operates against a group that historically has not been subject to governmental discrimination"); *see also Bass*, 256 F.3d at 1103 (" 'Our constitution is color-blind, and neither knows nor tolerates classes among citizens. In respect of civil rights, all citizens are equal before the law.' ") (citing *Plessy v. Ferguson*, 163 U.S. 537, 559 (1896) (Harlan, J., dissenting); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 239 (1995) (Scalia, J., concurring in part) ("In the eyes of government, we are just one race here. It is American."); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 289-90 (1978) (plurality opinion) ("The guarantee of equal protection cannot mean one thing when applied to one individual and something else when applied to a person of another color."). Accordingly, we will analyze a reverse discrimination claim as we would any racial discrimination claim.

**Plaintiff's Case Against Summary Judgment**

{44} In its motion for summary judgment, HVPS argued that Plaintiff failed to make out a prima facie case of discrimination. HVPS also asserted that it had a legitimate purpose for terminating Plaintiff's employment, citing an unsatisfactory evaluation and performance issues. Among the evidence of Plaintiff's purported performance issues was evidence that she had been involved in minor traffic accidents while driving her bus.

{45} Arguing against summary judgment, Plaintiff identified her protected group as white, or non-Hispanic. She presented her performance evaluation form, which did not describe her competence in any of the eleven evaluated categories as being unsatisfactory. Plaintiff also presented evidence concerning her training and experience, as well as evidence that other HVPS drivers, who did not belong to the protected class, had similar performance issues and were not terminated. Thus, Plaintiff has satisfied the prima facie case requirement to show that the circumstances of her termination give rise to an inference of discrimination and the burden shifts to HVPS to provide a legitimate purpose for Plaintiff's termination. *Smith*, 1990-NMSC-020, ¶ 11.

{46} HVPS claims that Plaintiff failed to raise a genuine issue of material fact that HVPS' reasons for not renewing her employment contract were pretext. A plaintiff

can show pretext by introducing "evidence of the falsity of the proffered reason for the employment action." *Garcia-Montoya v. State Treasurer's Office*, 2001-NMSC-003, ¶ 45, 130 N.M. 25, 16 P.3d 1084. As the New Mexico Supreme Court has noted, "[i]t is rare a defendant keeps documents or makes statements that directly indicate a retaliatory motive for terminating an employee." Therefore, "whether a proffered justification is legitimate, or is merely an excuse to cover up illegal conduct, is largely a credibility issue and often requires the use of circumstantial evidence." *Juneau*, 2006-NMSC-002, ¶ 23. "[S]ummary judgment is not an appropriate vehicle for courts" to weigh the evidence and judge the credibility of witnesses. *Id.* ¶ 27. Here, Plaintiff's evidence was sufficient to raise a question as to pretext. *See id.* ¶ 25 ("[The p]laintiff is not required to show disputed issues of fact for every element of the claim[.]").

{47}    HVPS argues that the deposition testimony of Byron Adams identifying a Hispanic male as one about whom he complained regarding the cleanliness of his bus, and was not fired—is hearsay and should not be considered. Plaintiff's counsel questioned Mr. Adams as follows:

> Q.    And you have complained to those people also—for those people, also, to Stephanie Brownfield?
>
> A.    To Vicky.
>
> . . . .

26

Q.      Okay. But to your knowledge, those people whom you've made complaints about their bus not being clean still work for the—

A.      Yes.

Q.      All right. Can you give me some names?

. . . .

A.      Henry Avalos.

It was Mr. Adams who made the complaint and Plaintiff's counsel qualified her secondary question by basing it on his knowledge. It is clear that Mr. Adams' testimony was based on personal knowledge and does not fall within the realm of hearsay. *See* Rule 11-602 NMRA ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may consist of the witness's own testimony."); *cf.* Rule 11-801(C)(1), (2) NMRA (defining "[h]earsay" as "a statement that . . . the declarant does not make while testifying at the current trial or hearing, and . . . a party offers in evidence to prove the truth of the matter asserted in the statement" (internal quotation marks omitted)).

{48}      We conclude that Plaintiff put forward sufficient evidence below to create genuine issues of material fact with respect to her discrimination claim against HVPS. *Bartlett v. Mirabal*, 2000-NMCA-036, ¶ 17, 128 N.M. 830, 999 P.2d 1062

27

(stating that the nonmoving party does not need to present enough evidence to support all elements of the case, only that one or two factual issues are contested).

**CONCLUSION**

{49}   We reverse the district court's summary judgment dismissing Plaintiff's claim for the reasons stated in this Opinion and remand it to the district court for proceedings consistent with this Opinion.

{50}   **IT IS SO ORDERED.**

_____
**M. MONICA ZAMORA, Judge**

**WE CONCUR:**

_____
**RODERICK T. KENNEDY, Judge**

_____
**TIMOTHY L. GARCIA, Judge**